## J. M. Tinsley v. J. A. and A. R. Scott.

1. BROKERS—*When Entitled to Commissions on a Sale of Property.*— Of several brokers, under employment at the same time, the one who first produces a customer is entitled to the commission. But the party presented must be a customer or client of his own, and not one sustaining that relation to another broker under like employment. And a prospective customer does not continue to sustain that relation after the negotiations are expressly broken off, or the matter of the purchase has ceased to be held under consideration by him.

**Transcript**, from a justice of the peace. Appeal from the County Court of Champaign County; the Hon. CALVIN C. STALEY, Judge, presiding. Heard in this court at the May term, 1896. Reversed and remanded. Opinion filed December 19, 1896.

GULICK & GULICK and J. L. RAY, attorneys for appellant.

WOLFE & SAVAGE, attorneys for appellees.

MR. JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

Appellees brought this action before a justice of the peace to recover commissions, as real estate brokers, on the sale of appellant's farm. On appeal to the County Court there was a trial by jury, a verdict for plaintiff, a motion for a new trial denied and judgment on the verdict for $80 and costs, to reverse which this appeal is prosecuted.

Early in June, 1895, appellant, then a practicing physician in Champaign, who a few months afterward removed to Canton, Mississippi, called at appellee's office and placed in their hands for sale his farm of eighty acres near Bondville. The price given was $85 per acre with, or $80 without, his share of the crop, and the commission to be paid was one dollar per acre. Within a few days thereafter Mr. William Birch, who was looking for a farm, called to see what they had for sale. They showed him their list, gave him some description and the price of appellant's land, telephoned to appellant to call, and introduced Mr. Birch as a gentleman who wanted to talk with him about buying it. Immediately after their conversation, appellee A. R. Scott rode out to appellant's farm with Birch, who, upon such examination as he then made, said he would not take it at the price given. Scott then drove with him a mile south and showed him another farm, known as the widow Dale farm, which he purchased three days thereafter. Scott testified: "I saw Tinsley that evening (the evening of the day he took Birch to see his farm) and told him that Birch would not take the farm at that price. I did not afterward make any effort to consummate the sale between Tinsley and Birch; I did not try to get Tinsley to take less, or induce Birch to come to Tinsley's terms; I did not sell Tinsley's land to Birch or any one else." His brother and co-appellee testified to the same effect, and neither intimated that they ever made any further effort to sell it to anybody, or knew of any person who proposed or wished to purchase it on any terms, until it was sold. About the middle of July, Birch met appellant for the first time since the

meeting in appellee's office, and after telling him that he had bought a farm near his, said he would like to rent appellant's, who replied that he didn't care to change tenants, but would sell the land to him. Birch did not intimate that he would like to purchase it.

Some time in the fall, for reasons not shown, Birch sold his widow Dale farm through J. B. McKee, another broker in Champaign, to whom and two others appellant had given his farm for sale and so informed appellees when he gave it to them. When Birch went to his office to execute the deed McKee asked him why he didn't buy the Tinsley farm, to which he answered that he wouldn't give as much as was asked for it. Then McKee told him he thought it could be bought for less than $80, and asked him to make an offer; which he finally did, of $76 per acre, with payment in part by a mortgage note of $2,500 of another party. This offer, when reported to Tinsley, was at first refused, but McKee got the parties together, and after some time it was accepted and the sale made accordingly. Tinsley paid McKee his commission. Shortly after the sale appellees learned that it had been made, and for less than the price given them. A. J. Scott says that on his return from a trip in Iowa, about the last of October or first of November, he met appellant on the street and was told by him that he had sold it. He did not then tell appellant that his firm would claim a commission, nor does it appear that any such claim was made before the suit was brought. He was asked if he ever made any until appellant was about to take the train for Mississippi, but the question was objected to by plaintiffs and excluded by the court; to which exception was taken. His testimony in the case was in form of a deposition from that State.

There is no dispute of the facts above stated. If they comprise all that were material, our opinion would be that the verdict was against the law and the evidence.

Counsel for appellees, however, while conceding these to be as here stated, claim that there was one other fact, not embraced in the foregoing statement, which was disputed,

but rightly found for the plaintiffs and established their right to recover. The fact was what is called the special contract between the parties. Appellant testified that he told appellees he had put the land in the hands of other real estate agents for sale, and further that "the man who sells it first gets the commission." Appellees, admitting that he told them other agents had it also, deny that he used the language quoted, and each testified that J. A. Scott said to appellant "we want to understand this; if we sell the land, or any other real estate agent sells it to our customer or the man we furnish, or if you sell it to him at a less price than that you have given to us, then we are to have our commission," and that appellant answered "all right." It is insisted that two of these three conditions actually happened; that another agent sold it to their customer or the man they furnished, and that appellant made the sale to him at a less price than that he had given to them.

We are unable to see that appellee's statement, if correct, shows a special contract, or adds to the conceded facts anything in the slightest degree material. Nor do we see in it anything at all inconsistent with that of appellant. Properly understood, they are both alike superfluous. Neither goes at all beyond the law in its application to the simple case of placing ône's land in the hands of a broker for sale at a price and for a commission stated, with notice that he has it in the hands of other brokers also on the same terms.

A broker so employed, though not thereby authorized to execute a deed or receive the price, does "sell" the land, in the sense of such employment, when he produces a party able, willing and ready to take it on the terms given, if no other such purchaser has been previously produced. Of several independent brokers under such employment at the same time, the one who first so sells is entitled to the commission. No express contract to that effect is required to give him that right. But to be a producer, the party presented must be a client or customer of his own, and not one

then sustaining that relation to another broker under like employment. If he was first in negotiation with such other he continues to sustain that relation to him until it is expressly broken off or the matter of the purchase has ceased to be held by him under consideration. The employer, with notice of the pendency of such negotiation, can not escape liability to the broker for his commission by selling to his customer through another, even, though he first discharges the former, if he does so without giving him a reasonable time to effect a sale. Day v. Porter et al., 60 Ill. App. 386, affirmed in 161 Ill. 235. Nor, for the same reason—that it would be bad faith towards the broker—could he so escape by making such sale himself, especially if he sold for a price less than that given to the broker.

Was Birch a customer or client of appellees with reference to the purchase of appellant's farm when McKee suggested it to him? If not, they have no right to the commission claimed, under the law or the special contract. In the case above cited both the courts held the controlling question to be whether, when the second broker intervened the purchaser "still held under consideration" the subject of the purchase proposed by the first; and so it is here.

Upon that question the evidence was wholly and clearly against the appellees. The only terms they ever offered or suggested to Birch were absolutely and promptly refused—immediately upon a half hour's view of the land. He made no offer on his part, nor was he asked to do so or to consider the matter further. All occasion for it was effectually removed by his purchase of the Dale farm within three days. His refusal was promptly reported by appellees to appellant, who treated it as final. They so understood it and therefore made no further effort with either party to bring about a sale. The inference from the facts stated is that they as brokers sold the Dale farm to Birch. They knew it was for sale or they would not have taken him directly from appellant to look at it. Probably it also was on their list and they got a commission for its sale. Appellant was informed of it within five or six weeks. He had

no knowledge of any pending negotiations between appellees and any other prospective purchaser, for there were none; and therefore the question of a reasonable time for concluding any such negotiations could not arise. After three months from the time Birch ceased to be their customer, McKee, upon new, unexpected and materially different conditions, brought about the sale to him and received from appellant his commission therefor.

The verdict was manifestly against the evidence, and should have been set aside. For error in refusing to do so, to say nothing of others, the judgment will be reversed and remanded.